**LAW OFFICE OF KARIM H. KAMAL**
430 East 86th Street, Suite 14B
New York, NY 10028
Tel: (212) 586-0510
khklaw@gmail.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW
## YORK NEW YORK DIVISION

| | |
|---|---|
| Annette O. Kamal & Hany M. Kamal, individually, and on behalf of all others similarly situated, | Case No: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| Pressler, Felt & Warshaw, LLP f/k/a Pressler & Pressler, LLP and LVNV Funding, LLC, | |
| Defendant. | |

Plaintiffs Annette O. Kamal and Hany Kamal ("Plaintiffs"), on behalf of themselves and all others similarly situated, for their complaint, allege, upon personal knowledge as to themselves and information and belief as to other matters, as follows:

**INTRODUCTION**

1.      This class action seeks to vindicate the rights of thousands of New York, New Jersey and Pennsylvania ("NY-NJ-PA") residents who have been victimized for years by a massive scheme to deprive them of due process and fraudulently obtain and enforce thousands of default judgments worth millions of dollars in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968

("RICO").

2.        The primary players in this fraudulent enterprise are (1) a law firm, Pressler, Felt & Warshaw, LLP, and its principals (the "PFW Defendants") and (2) an investor in domestic and international debt, LVNV Funding, LLC, and its principals (the "LVNV Defendants").

3.        The PWF Defendants have filed thousands of "consumer credit actions," or debt collection throughout NY-NJ-PA.  The PFW Defendants represent the LVNV Defendants in virtually all of the debt collection lawsuits they bring.  The vast majority of these lawsuits result in default judgments in favor of the LVNV Defendants.  On information and belief, more than 90% of the people sued by the LVNV and PFW Defendants do not appear in court.

4.        On information and belief, in nearly all of these lawsuits, Defendants engage in "sewer service"-failing to serve the summons and complaint and then filing fraudulent affidavits of service.  Defendants' practice of sewer service deprives Plaintiffs and putative class members of due process; without notice of the lawsuit filed against them, Plaintiffs and putative class members are denied their day in court.  On information and belief, sewer service is the primary reason so few of the people sued by Defendants appear in court to defend themselves.

5.        On information and belief, in nearly all of these lawsuits, Defendants do not possess and cannot obtain proof that the people they sue owe the alleged debts.

6.        In order to secure default judgments, the LVNV and PFW Defendants file false affidavits of service claiming that people were served when they were not, and false affidavits of merit claiming that Defendants have personal knowledge of the facts necessary to secure a default judgment when they do not.  Relying on these false affidavits, the Courts issued default judgments against Plaintiffs and putative class members.

7.        After Defendants have fraudulently obtained default judgments, they proceed to wrongfully restrain bank accounts, garnish wages, threaten to seize personal property, and/or pressure people into unaffordable payment plans.  These fraudulent judgments appear on people's credit reports, preventing them from obtaining housing, employment, insurance, and affordable credit.

8.        Plaintiffs seek to end these abhorrent practices once and for all.  Plaintiffs and putative class members are entitled to preliminary and permanent injunctive relief, including disgorgement, declaratory relief, and damages.

## JURISDICTION & VENUE

9.        This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d).

10.        Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

11.        At all relevant times, Defendants conducted business within the State of New York.

## PARTIES

12.        Plaintiffs Annette & Hany Kamal, husband and wife, are individuals and citizens of the State of New York residing in New York County, New York.

13.        Plaintiff Annette O. Kamal is a natural person allegedly obligated to pay a debt.

14.     Plaintiffs are "consumers" as defined by 15 U.S.C. § 1692a (3).

15.     On information and belief, Defendant Pressler, Felt & Warshaw, LLP is a New Jersey Limited Liability Partnership with a principal place of business in Morris County, New Jersey.

16.     On information and belief, Defendant LVNV Funding, LLC, is a Delaware Limited Liability Company with a principal place of business in New Castle County, Delaware.

## FACTS

### A. Background Facts

#### 1. Debt Buyers

17.     NY-NJ-PA is an epicenter for debt collection lawsuits. According to records obtained from the Court, debt collectors have been filing nearly 300,000 lawsuits *per year* since 2006. A substantial number of these lawsuits were brought by debt buyers.

18.     "Debt buyers" are companies, like the LVNV Defendants, that buy defaulted, charged-off debts for pennies on the dollar and then seek to collect the full-face value of the debts for themselves. Many debt buyers also resell debts to other debt buyers. Thus, it is not uncommon for debts to be bought and sold numerous times over.

19.     Debts are priced on a sliding scale, with freshly charged-off debts commanding a higher price than older debts that other debt buyers and collection agencies have previously tried and failed to collect. There is even an active market for debts that are past the statute of limitations and for debts that have previously been discharged in bankruptcy.

20.     A typical purchased portfolio of debts contains, for each account listed in the portfolio, the consumer's name, Social Security number, last known address and telephone number, and the account number, charge-off date, date and amount of last payment, and alleged amount owed.  This information is transmitted to the debt buyer electronically in the form of a spreadsheet and is often referred to as "media."  The debt buyer typically does not purchase or obtain documents showing an indebtedness between the original creditor and debtor, such as a contract and any subsequent amendments to the contract, account statements, customer service records, or customer dispute records.

21.     Some debt purchase and sale agreements provide that the debt buyer may go back to the original creditor and obtain account documentation for only a limited period of time and in only a limited number of accounts, such as 2% of accounts.  Other purchase and sale agreements provide that the debt buyer may *never* obtain *any* documentation for any debts in the portfolio.  In addition, each time a debt is resold, it becomes less likely that the purchaser will be able to obtain documentation of the debt.

22.     As a result, most debt buyers have significant difficulty substantiating their claims, which has been widely recognized as a problem for the industry and for consumers. *See, e.g.,* Federal Trade Commission, *Collecting Consumer Debts: The Challenges of Change* (2009) (discussing problem and proposing solutions).

23.     Debt buyers use multiple tools to collect consumer debts, including contacting consumers directly by mail, telephone, text message and e-mail, reporting the debt to credit reporting agencies, and hiring other debt collectors to collect the debt for them.  Increasingly, however, debt buyers have turned to the courts to collect consumer debts.

24.     Under NY-NJ-PA law, debt buyers, like other plaintiffs in civil lawsuits, bear the burden of proof in legal actions. In order to prevail, the debt buyer must submit admissible evidence demonstrating that it is the rightful owner of the account and that the defendant actually owes the debt in the precise amount claimed. *See, e.g., Citibank v. Martin,* 807 N.Y.S.2d 284 (Civ. Ct. N.Y. County 2005).

25.     Debt buyers generally do not obtain additional account documentation prior to bringing a lawsuit against a consumer. Instead, debt buyers generally bring lawsuits based solely upon the skeletal "media" obtained upon purchase of the account portfolio. This "media" is not sufficient to meet the debt buyer's burden of proof as the plaintiff in a lawsuit.

26.     Furthermore, because purchase and sale agreements severely limit or wholly eliminate debt buyers' ability to obtain documentation of the debts from the original creditor, debt buyers are actually *unable* to obtain admissible evidence of the debt in the vast majority of cases that they file.

27.     Recent court decisions confirm that many debt buyers do not possess, and cannot obtain, the evidence required to make out a prima facie case. *See, e.g., PRA III, LLC v. Gonzalez,* 54 A.D.3d 917 (App. Div. 2d Dep't. 2008); *CACH, LLC v. Davidson,* 21 Misc. 3d 1106(A) (Civ. Ct. N.Y. County 2008); *PRA III, LLC v. McDowell,* 15 Misc.3d 1135(A) (Civ. Ct. Richmond County 2007); *Rushmore v. Skolnick,* 15 Misc.3d 1139(A) (Dist. Ct. Nassau County 2007); *Citibank. Martin,* 11 Misc.3d 219 (Civ. Ct. N.Y. County 2005); *Palisades Collection, LLC v. Gonzalez,* 10 Misc.3d. 1058(A) (Civ. Ct. N.Y. County 2005); *Colorado Capital Investments, Inc. v. Villar,* 06/18/09 N.Y.L.J. 27, col. 3 (Civ. Ct. N.Y. County); *Palisades*

*Collection, LLC v. Haque,* 4/13/06 N.Y.L.J. 20 (Civ. Ct. Queens County); *CACV of Colorado, LLC v. Chowdhwy,* Index No. 94642/07 (Civ. Ct. Bronx County Feb. 19, 2009) (unpublished); *CACH v. Cummings,* Index No. 2274/07 (Civ. Ct. N.Y. County Nov. 10, 2008) (unpublished); *CACV o_f Colorado Capital Investments v. Pierog,* No. 64449/05 (Civ. Ct. N.Y. County, Sep. 2, 2008) (unpublished).

28.    Because of the high rate of defaults by defendants in debt collection lawsuits, however, debt buyers are rarely put to their proof.

29.    Consumers appear to defend themselves in only about 10% of the cases in the Court, and debt buyers obtain default judgments in the vast majority of lawsuits that they bring. On information and belief, sewer service is the primary reason so few defendants appear in court.

**B.  "Sewer Service"**

30.    The term "sewer service" is widely used to describe the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit of service. Sewer service deprives people of due process because they do not get notice of the lawsuits and are denied their day in court. Default judgments are then entered on the basis of defendants' failure to appear. As the affidavit of service often appears facially valid - indeed, its very purpose is to pass facial review - the fraud generally goes undetected unless the defendant discovers and challenges the fraudulent affidavit after a default judgment has been entered.

31.    Sewer service has a long history in NY-NJ-PA. During the late 1960s and early 1970s, Courts were inundated with tainted consumer claims, many of which were reduced to judgment when the defendant defaulted as a result of sewer service. When the Courts learned of the widespread fraud, it employed its general police powers to vacate thousands of default judgments.

32.     Sewer service remained "rampant" into the 1980s, according to a 1986 report issued by the Office of the New York State Attorney General and the New York City Department of Consumer Affairs (the "Joint Report").  The Joint Report concluded that 39% of all service in New York City was sewer service, and that "a staggering number of illegal default judgments - 48,649, or one third of all default judgments - are entered annually."

33.     The Joint Report further concluded that low pay for process servers was the primary cause of sewer service.  At the time, debt collection attorneys paid $6 to $12 to process serving agencies per service of process in a debt collection lawsuit.  The agencies, in sum, generally paid only $3 to the individual process server who was assigned the task of serving the defendant.  Moreover, the process server was paid only for completed services, not for unsuccessful attempts.

34.     The Joint Report detailed the experience of an investigator for the New York City Department of Consumer Affairs who worked for one month as a licensed process server in order to determine whether a process server could attempt to effect proper service and still make a living at the prevailing pay scales.  During that month, the investigator was given over 400 papers to serve and was paid $3 per completed service.

35.     According to the Joint Report, the investigator was unable to serve almost one-half of the papers because the defendants no longer lived at the addresses provided for service.  After making 537 attempts, the investigator was able to serve only 217 complaints, resulting in earnings of about $600 before deductions for taxes and expenses (such as gas).  Thus, the investigator made less than half of the minimum wage.

36.     The Joint Report concluded that process serving agencies, by underbidding the true cost of proper service, effectively sold sewer service.

37.     Finally, the Joint Report included a comprehensive review of the logs of 37 randomly selected process servers. The Joint Report found that 95% of the process servers reported duplicate, or "superman," services. That is, they claimed to have served process at two or more different places at the exact same time-a physical impossibility.

38.     In 1987, the New York Court of Appeals noted "a continuing and pervasive problem of unscrupulous service practices by licensed process servers." *Barr v. Dep't of Consumer Affairs,* 70 N.Y.2d 821, 822-23 (1987). The Court explained: These practices deprive defendants of their day in court and lead to fraudulent default judgments. Often associated with consumer debt collection and landlord/tenant litigation, questionable service practices have their greatest impact on those who are poor and least capable of obtaining relief from the consequences of an improperly imposed default judgment.

39.     Sewer service in debt collection cases remains rampant to this day.

40.     In June 2008, MFY Legal Services ("MFY") issued a report, *Justice Disserved* ("Justice Disserved"), documenting highly questionable process serving practices in consumer credit cases. On June 13, 2008, the New York City Department of Consumer Affairs held a public hearing on process servers in New York City ("DCA hearing"). Testimony at the hearing revealed that: (a) process serving agencies generally charge between $15 and $45 for service of a summons and complaint in a consumer credit action in New York City; (b) the companies retain most of the fees to pay for overhead; (c) individual process servers were paid between $3 and $6 per completed service.

41.    Process servers in debt collection lawsuits today are thus paid basically the same wages as they were *23 years ago.* In 1986, subway fare was $1 and a gallon of gas cost 93 cents. Since 1986, the cost of living has increased substantially and the minimum wage has more than doubled, yet process server wages have remained stagnant at a rate that was insufficient to cover the costs of proper service even then. Process servers in other types of legal actions are paid substantially more.

42.    At the DCA hearing, every process serving agency that testified said debt collection attorneys will not pay for service attempts that are not completed. In other words, a process server who visits the last known address of a debtor and learns that the debtor has moved or died will only be paid if he perjures himself. The Vice President of the New York State Professional Process Servers Association questioned the ethics of debt collectors paying only for completed service and will not accept contracts with such a condition.

43.    On information and belief, the PFW and LVNV Defendants will pay process serving agencies only for completed service, thereby knowingly promoting the use of false affidavits of service.

44.    Moreover, at the DCA hearing, executives from three different process serving agencies testified that they refused to accept work from consumer debt collection attorneys because they could not make a profit based on the low fees the collection attorneys demand unless their process servers engaged in sewer service. For those who testified, this meant that they cannot do business with operations like those run by the PFW and LVNV Defendants. Others, however, are less scrupulous and thus willing to join and further a fraudulent enterprise.

45.     In 2008 and 2009, after the DCA hearing, the Office of the New York State Attorney General ("Attorney General") audited the process server logs of a single process serving agency called American Legal Process ("ALP").

46.     The Attorney General found that: (a) ALP was paid $30-$35 by the debt collection law firms per service of a summons and complaint in a consumer matter (usually credit card related); and (b) ALP in turn paid its process servers as little as $3 per service and no more than $7 per service, for an average of $5.

47.     The Attorney General reviewed process server logs for internal inconsistencies and found countless examples of sewer service. For example, one process server claimed to have made 69 service attempts in a single day in two different New York counties that were 400 miles apart-at 8:19 a.m., he claimed to have attempted service on a defendant in Brooklyn, and one minute later, at 8:20 a.m., on another defendant in Western New York. The Attorney General found that the process server would have had to drive more than 10,000 miles that day to make all his purported service attempts, and further found that such physically impossible movements were documented repeatedly throughout the service logs of ALP's 20 busiest process servers.

48.     The Attorney General also uncovered significant notary fraud on the part of ALP's owner.

49.     In July 2009, the Attorney General and Chief Administrative Judge of the New York Courts sued American Legal Process and 37 debt collection law firms and debt collectors, seeking to overturn 100,000 default judgments that had been entered as a result of sewer service by ALP's process servers.

50.      On information and belief, the practices exposed by the Attorney General are not unique to ALP, but are standard practice throughout the debt collection and process serving industries in NY-NJ-PA.

51.      Debt collection law firms and their debt buyer clients plainly benefit from sewer service. By not serving consumer debt defendants, debt collection firms like the PFW Defendants and debt buyers like the LVNV Defendants are able to generate hundreds of thousands of judgments by default on cases where they could never prevail on the merits because they do not have evidence to make out a prima facie case. Once default judgments are fraudulently obtained, they are used to restrain people's bank accounts, garnish their wages, seize their property, damage their credit reports, and/or pressure them into unaffordable payment plans.

52.      Proceeds from the illegal scheme are then used to fund the purchase of new debts, which are then pursued by commencing new actions without the ability to actually prove that a debt is owed, using sewer service, which is followed by the filing of new perjurious affidavits of service and merit, thus securing new default judgments. And, the cycle continues.

**A. Plaintiffs' Facts**

53.      Plaintiffs Hany and Annette Kamal are husband and wife. Annette is retired, is 91 years old and suffers from Progressive Supranuclear Palsy. Hany is retired as well, is 83 years old, but works part-time as a translator in New York City hospitals. He is fluent in English, Arabic and Russian. At the time of the events recounted here, plaintiffs were receiving Social Security Benefits, which was their primary source of income, as Hany Kamal's income is less than $750 per month on average for his work as a translator.

54.      On or about February 24, 2023, Defendant PFW commenced a lawsuit against Annette O. Kamal in Superior Court of New Jersey. Defendant LVNV was the plaintiff in the suit.

55.      Plaintiffs were never served with a summons and complaint, either personally, by substitute service, or by nail and mail service. Moreover, Plaintiffs have never been residents of New Jersey,

but have lived in New York County since 1968.

56.    The PFW Defendant also affirmed  that they sent a copy of the summons and complaint to Plaintiffs via U.S. mail.  Plaintiffs did not receive this mailing.

**B.  Class Action Allegations**

57.    Plaintiffs bring this case as a class action under three distinct subdivisions of Fed. R. Civ. P. 23(b).

58.    First, Plaintiffs seek certification of a Rule 23(b)(l)(A) and/or 23(b)(2). Class consisting of all persons who have been or will be sued by the PFW Defendants as counsel for the LVNV Defendants in actions commenced  in any NY-NJ-PA Court and where a default judgment  has been or will be sought.

59.    The prosecution  of separate  actions  by individual  members  of the proposed (b)(1)(A) and (b)(2) class would create the risk of inconsistent or varying adjudications which would establish incompatible  standards of conduct  for defendants.

60.    Defendants have acted, or failed to act, on grounds generally applicable  to the Rule (b)(1)(A) and (b)(2) Class, thereby making  appropriate  final  injunctive relief with respect to the Class as a whole.

61.    On information  and  belief,  the  Rule  (b)(l)(A)  and  (b)(2)  class  includes thousands of members.  They are so numerous that joinder of all Class members is impracticable.

62.    Second, plaintiffs seek certification  of a Rule 23(b)(3) class consisting of all persons who have been sued by the PFW Defendants as counsel  for the LVNV Defendants in any actions commenced  where a default  judgment has been entered against them.

63.    All of the members  of the Rule (b)(3) class were injured  as a result of defendants' conduct.

64.    On information and belief, the Rule (b)(3) class includes tens of thousands of

individuals.  They are so numerous that joinder of all Class members is impracticable.  There are numerous questions of law and fact common to the class.  Chief among them are whether Defendants' actions, as described above, violate the Fair Debt Collection Practices Act, the Racketeer Influenced and Corrupt Organizations Act.  These common issues predominate over any individual issues.

65.    Defendants' conduct towards Plaintiffs and all absent members of the proposed classes has resulted in fraudulently obtained judgments of default being entered, which has, in turn, caused serious harm.  The claims and practices alleged in this complaint are common to all members of the class.

66.    The violations suffered by the individual plaintiffs are typical of those suffered by the class.  The entire class will benefit from the remedial and monetary relief sought in this action.

67.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members of the class is impracticable, and the damages suffered, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly unlikely that individual actions will be pursued.  Managing this case as a class should not present any particular difficulty.

### FIRST CAUSE OF ACTION
(FDCPA, 15 U.S.C. § 1692)

68.    Plaintiffs hereby restate, reallege, and incorporate by reference all foregoing paragraphs.

69.    Congress enacted the Fair Debt Collection Practices Act to stop "the use of abusive, deceptive and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

70.    A debt collector may not "use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.  Such a prohibition includes the false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).  Such a prohibition also includes the "use of any false representation or deceptive means to collect or attempt to

-14-

collect any debt." 15 U.S.C. § 1692e(l0).

71.    A debt collector may not "use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

72.    Nor may a debt collector "engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d.

73.    Defendants violated the FDCPA, 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(10) and 1692f by making false and misleading representations, and engaging in unfair and abusive practices. Defendants' violations include, but are not limited to:

(a) Producing and filing fraudulent affidavits of service that falsely claim that Plaintiffs arid class members were served with a summons and complaint when in fact they were not;

(b) Producing and filing false attorney affirmations stating that service of the summons and complaint has been made, when in fact it was not;

(c) Producing and filing fraudulent affidavits of merit that falsely claim that Defendants have personal knowledge of the facts necessary to obtain a default judgment, when in fact they do not;

(d) Misrepresenting that Defendants are in possession of or could obtain documentation evidencing that Plaintiffs and class members owe a debt, when in fact they do not possess and cannot obtain such documentation;

(e) Using fraudulent, deceptive, and misleading affidavits and affirmations to obtain default judgments against Plaintiffs and class members under false pretenses;

(f) Using fraudulently obtained default judgments to extract money from Plaintiffs

74.       As a direct and proximate result of Defendants' violations of the FDCPA, Plaintiffs have sustained actual damages in an amount to be proved at trial and are also entitled to statutory damages, costs and attorneys' fees.

### SECOND CAUSE OF ACTION
(Civil RICO, 28 U.S.C. § 1962(c) & (d))

75.       Plaintiffs hereby restate, reallege, and incorporate by reference all foregoing paragraphs.

76.       Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

77.       Defendants are natural persons and corporate entities, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

**The Enterprise**

78.       On information and belief, the PFW Defendants and the LVNV Defendants comprise two distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4).  Each and every defendant is employed by or associated with the enterprise.

79.       On information and belief, each group of defendants, the PFW Defendants and the LVNV Defendants also qualify as separate and distinct enterprises within the meaning of 18 U.S.C. § 1961(4).  Each and every PFW Defendant is employed by or associated with the PFW enterprise, and each LVNV defendant is employed by or associated with the LVNV enterprise.

80.       On information and belief, the individuals and entities that constitute the PFW Defendants and the LVNV Defendants are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

81.       The purpose of the enterprise and/or enterprises (collectively "Enterprise") is to secure default judgments through fraudulent means and to use those judgments to extract money from Plaintiffs and putative class members.  This is accomplished by the LVNV Defendants buying debts for collection; the PFW Defendants commencing actions in the Court on behalf of the LVNV Defendants; the

PFW and LVNV Defendants obtaining default judgments against Plaintiffs and putative class members through fraudulent means and PFW Defendants providing fraudulent affidavits of service in furtherance of the scheme. The relationships between the two defendant groups are longstanding and ongoing.

82.     The Enterprise has for many, but no fewer than four, years been engaged in, and continues to be engaged in, activities that affect interstate commerce. Defendants' unlawful Enterprise in violation of RICO has been and remains longstanding, continuous and open ended.

**Pattern of Racketeering Activity - Mail and Wire Fraud**

83.     Defendants, individually and collectively, as an Enterprise, have engaged, directly or indirectly, a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

84.     Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. The scheme includes but is not limited to:

  (a) Producing and filing fraudulent affidavits of service that falsely claim that Plaintiffs and class members were served with a summons and complaint when in fact they were not;

  (b) Producing and filing false attorney affirmations stating that service of the summons and complaint has been made, when it fact it was not;

  (c) Producing and filing fraudulent affidavits of merit that falsely claim that Defendants have personal knowledge of the facts necessary to obtain a default judgment, when in fact they do not;

  (d) Misrepresenting that Defendants are in possession of or could obtain documentation evidencing that Plaintiffs and class members owe a debt, when in fact they do not possess and cannot obtain such documentation;

  (e) Using fraudulent, deceptive, and misleading affidavits and affirmations to obtain default

judgments against Plaintiffs and class members under false pretenses;

(f)  Using fraudulently obtained default judgments to extract money from Plaintiffs and class members.

85.      Defendants, acting individually and as part of the Enterprise, have made fraudulent misrepresentations on specific occasions as described above.

86.      Defendants, acting individually and as part of the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their fraudulent scheme.

87.      Defendants have used the mails and wires in connection with every default judgment that they have fraudulently obtained, and each use of the mails and wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiffs and putative class members by means of false pretenses and representations.

88.      On information and belief, each and every defendant has specific knowledge that the mails and wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used because the relevant state codes and other governing statutes make use of the mails and wires mandatory. Indeed, no default judgment can be obtained without approximately half a dozen uses of the mail and wires, and frequently more.

89.      Each of the tens of thousands of uses of the mails and wires in connection with Defendants' schemes to defraud, spanning a period of no fewer than four years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

90.      In connection with Defendants' schemes, the acts of racketeering activity have

occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.,* and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated over and over again.

**Relationship of Pattern of Racketeering Activity to Enterprise**

91.      As described, the goal of Defendants' Enterprise is to obtain default judgments through fraudulent means and to use those judgments to extract money and property from Plaintiffs and putative class members.

92.      The pattern of racketeering activity described above is integral to Defendants' scheme. Without engaging in mail and wire fraud, Defendants would be unable to obtain the default judgments they seek.

93.      Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

94.      Moreover, each Defendant, has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).

95.      As a direct and proximate result of the RICO violations described in this Complaint, Plaintiffs and putative class members have suffered substantial injuries. Plaintiffs and putative class members have been deprived of due process and have had money judgments entered against them on default which have then been used to extract money from them by restraining and levying on their bank accounts, causing them to incur bank fees and miss work days, garnishing their wages, damaging their credit ratings, and/or leveraging these and other means to secure agreements to pay more money to Defendants, thus constituting an injury to Plaintiffs' property within the meaning of 18 U.S.C.

§ 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) & (d).

96.    Defendants' misrepresentations to the courts secured the default judgments that caused concrete injury to Plaintiffs' property.  As a result, Plaintiffs have suffered damage to their property within the meaning of 18 U.S.C. § 1964, by the actions of defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) & (d).

97.    Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced as long as a decade ago and has continued to the present. The pattern of racketeering activity has been directed towards hundreds of thousands of persons, including Plaintiffs, and the pattern has spanned many years.

98.    For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to recover compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

**WHEREFORE,** Plaintiffs and members of the class request the following relief jointly and severally as against all defendants:

(1) An order certifying this case as a class action under Fed. R. Civ. P. 23;

(2) A judgment declaring that Defendants have committed the violations of law alleged in this action;

(3) An order enjoining and directing Defendants to comply with the CPLVNV in their debt collection activities, including without limitation:

(a) Directing Defendants to cease engaging in debt collection practices that violate the FDCPA and RICO;

(b) Directing Defendants to locate class members and notify them that a default judgment has been entered against them and that they have the right to file a motion with the court to re-open their case, and to provide each class member

with a copy of the affidavit of service filed in their action;

    (c) Directing that Defendants serve process in compliance with the law in any and all future actions;

    (d) Directing Defendants to produce and file affidavits of merit in future actions that truthfully and accurately reflect their personal knowledge of the facts, or lack thereof;

(4) Actual and/or compensatory damages against all Defendants in an amount to be proven at trial;

(5) Treble damages pursuant to RICO;

(6) Statutory damages pursuant to the FDCPA;

(7) An order awarding disbursements, costs, and attorneys' fees pursuant to the FDCPA, RICO, and NY GBL § 349; and

(8) Such other and further relief that may be just and proper.


DATED:      November 30, 2023
New York, NY

           Respectfully Submitted,


           _____
Karim H. Kamal (KK-2279)
Law Office of Karim H. Kamal
430 East 86th Street, Suite 14B
New York, NY 10028
Tel: (212) 586-0510